Slip Op. 15-64

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| LDA INCORPORADO,<br><br>        Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>        Defendant. | Before: Claire R. Kelly, Judge<br><br>Court No. 12-00349 |

## <u>OPINION</u>

[Upon submission of Joint Stipulation of Undisputed Facts and Proposed Conclusions of Law, in lieu of trial, judgment is granted in favor of Plaintiff.]

Dated: June 19, 2015

<u>Ronald M. Wisla</u>, <u>Lizbeth R. Levinson</u>, Kutak Rock LLP, of Washington, DC, for Plaintiff.

<u>Beverly A. Farrell</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, for Defendant.  With her on the brief were <u>Benjamin C. Mizer</u>, Principal Deputy Assistant Attorney General, and <u>Amy M. Rubin</u>, Assistant Director.

Kelly, Judge:  Before the court is the parties' Joint Stipulation of Undisputed Facts and Proposed Conclusions of Law, which was submitted in lieu of trial.  <u>See</u> Joint Stipulation Undisputed Facts Proposed Conclusions of Law, May 8, 2015, ECF No. 49 (separately "JSUF," "Pl.'s PCL." and "Def.'s PCL").[1]  Familiarity with the case is presumed, however, the court provides a brief recitation of the procedural history of the

---

[1] The parties filed a single document including their joint submission of undisputed facts and their separate proposed conclusions of law.

case following the court's earlier denial of Defendant United States' ("Defendant" or "United States") motion to dismiss for lack of subject-matter jurisdiction.

On May 13, 2014, this court denied Defendant's motion to dismiss for lack of subject-matter jurisdiction.  See LDA Incorporado v. United States, 38 CIT __, __, 978 F. Supp. 2d 1359 (2014).   Thereafter, Defendant submitted its answer to Plaintiff LDA Incorporado's ("Plaintiff" or "LDA") complaint, and the court entered a scheduling order governing discovery and other trial related matters.  See Answer, June 26, 2014, ECF No. 34; Scheduling Order, July 2, 2014, ECF No. 36.

On March 13, 2015, LDA, with Defendant's consent, moved "to submit a joint stipulation of agreed upon facts in lieu of trial . . . ."  Pl.'s Consent Mot. Permit Parties Submit Joint Stipulation Agreed Upon Facts in Lieu of Trial, Mar. 13, 2015, ECF No. 39. After conferring with the parties, the court granted LDA's consent motion and ordered the parties to submit a "joint stipulation of undisputed facts and proposed conclusions of law . . . ."  Order, Mar. 16, 2015, ECF No. 41.  The parties submitted their Joint Stipulation of Undisputed Facts and Proposed Conclusions of Law on May 8, 2015, and the court deemed the matter submitted for resolution.  As the parties have stipulated to the facts and only continue to disagree about whether jurisdiction exists, a legal issue already decided by the court, the court finds that based on the undisputed facts, LDA's protest was erroneously denied and will enter judgment accordingly.

## UNDISPUTED FACTS

The following facts are undisputed.[2]

1. LDA "is a Puerto Rican corporation located in Guaynabo, Puerto Rico. Plaintiff is an importer and reseller of electrical infrastructure products, including galvanized electrical rigid steel conduit, for use in the construction industries. Plaintiff represents foreign manufacturers in the local Puerto Rico market."  JSUF ¶ 1 (citing Compl. ¶ 8, Apr. 16, 2013, ECF No. 5; Pl.'s Resp. Def.'s Mot. Dismiss 2, Dec. 24, 2013, ECF No. 17 ("Pl.'s Resp.")).

2. LDA's "customers are electrical material distributors that operate in both Puerto Rico and the United States."  Id. ¶ 2 (citing Compl. ¶ 8; Pl.'s Resp. 2, Ex. 1 at Attach. 8).

3. "LDA does not undertake any finishing or further processing operations prior to the resale of its imports."  Id. ¶ 3 (citing Compl. ¶ 8; Pl.'s Resp. 2).

4. "On July 22, 2008, the U.S. Department of Commerce ("Commerce") issued antidumping and countervailing duty orders covering circular welded carbon quality steel pipe from the People's Republic of China."  Id. ¶ 4 (citing Circular Welded Carbon Quality Steel Pipe from the People's Republic of China, 73 Fed. Reg. 42,545 (Dep't Commerce July 22, 2008) (notice of amended final affirmative countervailing duty determination and notice of

---

[2] In the stipulated facts, the parties cite to the record as filed with the court without objection.  In lieu of trial, the court considers the undisputed facts before it as contained in the stipulation and in the record.

countervailing duty order) ("CVD Order"); <u>Circular Welded Carbon Quality</u>
<u>Steel Pipe from the People's Republic of China</u>, 73 Fed. Reg. 42,547 (Dep't
Commerce July 22, 2008) (notice of antidumping duty order) ("ADD Order")
(collectively "the Orders")).

5.   "The express language of the AD and CVD orders specifically excluded
'finished electrical conduit' from their scope."  <u>Id.</u> ¶ 5.   The language of the
Orders provide that

> [t]he scope of this order does not include: (a) pipe suitable for use in
> boilers,  superheaters,  heat  exchangers,  condensers,  refining
> furnaces and feedwater heaters. whether or not cold drawn; (b)
> mechanical tubing, whether or not cold-drawn; (c) finished electrical
> conduit; (d) finished scaffolding; (e) tube and pipe hollows for
> redrawing;  (f)  oil  country  tubular  goods  produced  to  API
> specifications; and (g) line pipe produced to only API specifications.

CVD Order at 42,546 (cited in JSUF ¶ 5).[3]

6.   Both before and after Commerce issued the Orders, "Plaintiff purchased
rigid steel conduit manufactured by Guangdong Walsall Steel Pipe
Industrial Co., Ltd. ("Walsall"), a Chinese manufacturer."  JSUF ¶ 6 (citing
Pl.'s Resp. 3).   Walsall galvanizes the product "through a hot dipped
process."  <u>Id.</u> (citing Compl. ¶ 10; Pl.'s Resp. Ex. 4 at 2).

7.   "On July 22, 2010, Plaintiff imported into the United States at the Port of
San Juan[,]Puerto Rico a single entry (Entry No. 438-0698613-9) of
galvanized rigid steel conduit from China."  <u>Id.</u> ¶ 7 (citing Pl.'s Resp. Ex. 1

---

[3] The scope of the CVD Order and the ADD Order use nearly identical language.

at Attach. 1 at 1).  Plaintiff entered the merchandise "as a Type I entry, not subject to the AD and CVD orders."  Id. (citing Pl.'s Resp. Ex. 1 at Attach. 1 at 1).

8.  Upon import, Plaintiff's "galvanized electrical conduit was both internally and externally coated with a non-electrically insulating material (zinc) and was suitable for electrical use in accordance with Underwriters Laboratories Inc. ("UL") standard UL-6 for 'electrical rigid ferrous metal conduit' and American National Standard Institute ("ANSI") standard C80.1-2005 for 'electrical rigid steel conduit.'"  Id. ¶ 8 (citing Pl.'s Resp. Ex. 1 at Attachs. 3, 6).

9.  "The commercial invoice associated with Entry No. 438-0698613-9 describes the merchandise as '9134 pcs of rigid conduit galvanized rigid conduit with stantdards (sic) compliance of ANSI C80-1 and Underwriters Laboratories UL-6 with a standard length of 10 feet, coupling included.'"  Id. ¶ 9 (citing Commercial Invoice in Court file.).   "Other entry documents, including the packing list, mill report, and bill of lading, all reference the UL-6 or ANSI C.80-1 standards."  Id. (citing Court file).

10. The U.S. Customs and Border Protection ("CBP" or "Customs") conducted laboratory inspections of the imported merchandise after its entry and "[t]he CBP laboratory issued seven laboratory reports (one for each of the diameter sizes contained in the shipment).  Each of the laboratory reports described the sample as 'galvanized conduit' and concluded that 'the pipe

is composed of zinc-galvanized low carbon non-alloy steel'.  Each of the

laboratory reports also contained the following conclusion: 'In our opinion,

the sample is not internally coated with a non-conducting liner.'"  Id. ¶ 10

(citing Pl.'s Resp. Ex. 1 at Attach. 1 at 5–18).

11. "On January 10, 2011, CBP issued a Notice of Action notifying Plaintiff that

CBP was assessing antidumping and countervailing duties on the subject

merchandise."  Id. ¶ 11 (citing Pl.'s Resp. Ex. 1 at Attach. 1 at 3; Court file).

"Plaintiff was required to file a revised entry form reflecting the assessment

of antidumping and countervailing duty deposits."  Id. (citing Pl.'s Resp. Ex.

1 at Attach. 1 at 2; Court file).  "The Notice of Action did not state the reasons

for the rate advance, but during telephone conferences and a face-to-face

meeting on January 26, 2011, CBP advised LDA that the laboratory

inspections indicated that the subject merchandise was not internally

galvanized and was thus unfinished conduit subject to the antidumping and

countervailing duty orders."  Id. (citing Pl.'s Resp. 4–5).

12. "By letter dated January 28, 2011, Plaintiff provided CBP with additional

information to establish that the subject merchandise was both externally

and internally coated with zinc."  Id. ¶ 12 (citing Pl.'s Resp. Ex. 4).  "The

documents included proof of Walsall compliance with ANSI C.80 [sic] and

UL-6 standards; resubmission to CBP of the purchase/entry documents

including the commercial invoice, packing list bill of lading, mill certificate

and certificate of origin, all stating compliance with ANSI and UL standards;

and the pro forma invoice (purchase order) and letter of credit showing merchandise in compliance with ANSA [sic] and UL standards." Id. (citing Pl.'s Resp. Ex. 1 at Attach. 5 at 1–3, 7–8, Attach. 6 at 1–2, Ex. 3 at 2–6). "Further, Plaintiff explained to CBP that Walsall galvanized the purchased conduit using the 'hot dipped galvanized' process, which internally and externally galvanizes the product." Id. (citing Pl.'s Resp. Ex. 4 at 2).

13. On February 28, 2011, CBP released reports of the results of its laboratory inspections to Plaintiff in response to a Freedom of Information Act Request. Id. ¶ 13 (citing Pl.'s Resp. Ex. 1 at Attach. 1 at 4). "The reports stated: '[i]n our opinion, the sample is not internally coated with a non-conducting liner.'" Id. (citing Pl.'s Resp. Ex. 1 at Attach. 1 at 5–18). "Plaintiff responded to these reports by telling CBP that the absence of a 'non-conducting liner' does not refer to zinc, a metal coating that conducts electricity, but refers to an internal lining of materials that do not conduct electricity, such as rubber or plastic." Id. (citing Pl.'s Resp. 6).

14. "In early March 2011, Plaintiff and CBP had another meeting. CBP advised Plaintiff that CBP now understood that the Plaintiff's conduit was both internally and externally galvanized, but CBP continued to determine that that [sic] the subject merchandise was unfinished conduit and was not suitable for electrical use because it was not internally coated with a non-conducting liner." Id. ¶ 14 (citing Pl.'s Resp. 6–7).

15. "Plaintiff provided additional product samples to CBP for further testing. Each physical sample was marked with an adhesive label that identified Walsall as the manufacturer, China as the country of origin, and contained the UL trademark identifying the conduit as a UL listed 'electrical rigid metal conduit' product. Each conduit piece was also stenciled with permanent ink identifying the product dimension, the Chinese country of origin and the UL 6 designation as electrical rigid steel conduit ("RSC")." Id. ¶ 15 (citing Pl.'s Resp. Ex. 1 at Attach. 4).

16. "Plaintiff provided to CBP the Scope of the ANSI Standard C80.1-2005. The ANSI standard specifies that conduit with a galvanized (i.e., zinc) interior and exterior coating is 'finished' conduit. There is no additional requirement that a finished conduit include an electrically insulating interior coating. The ANSI standard states:

1. Scope

This standard covers the requirements for electrical rigid steel conduit for use as a raceway for wires or cables of an electrical system. **Finished conduit** is produced in nominal 10 ft. (3.05m) lengths, threaded on each end with one coupling attached. It is protected on the exterior surface with a metallic zinc coating or alternate corrosion protection coating (as specified in the 13th edition of UL 6 in Clauses 5.3.3, 6.2.4, 7.8 and 7.9) and on the interior surface with a zinc or organic coating."

Id. ¶ 16 (citing Pl.'s Resp. Ex. 1 at Attach. 9).

17. Plaintiff also gave CBP material from the product brochure of a domestic competitor, Wheatland Tube, "for metal conduit. The electrical conduit

products offered by Wheatland Tube were similarly subject to the ANSI C 80.1 and UL6 standards, were internally and externally coated with zinc, and did not have interior coatings of electrically insulating materials." Id. ¶ 17 (citing Pl.'s Resp. Ex. 1 at Attach. 10); See also Pl.'s Resp. 8.

18. "As a result of these meetings, CBP advised Plaintiff that the case would be referred to CBP headquarters for further review."   JSUF ¶ 18 (citing Pl.'s Resp. 9).  "On April 26, 2011, Plaintiff received a communication from CBP via electronic mail stating that personnel from CBP Headquarters had been consulted and that CBP Headquarters advised CBP Puerto Rico that Plaintiff should request a scope ruling from Commerce to determine whether or not the subject merchandise was subject to antidumping and countervailing duties." Id. (citing Pl.'s Resp. Ex. 5).

19. "On January 4, 2012 Customs issued a second notice of action concerning Entry No. 438-0698613-9." Id. ¶ 19 (citing Compl. ¶ 18; Court file).

20. "On January 27, 2012, CBP liquidated Plaintiff's entry subject to antidumping and countervailing duties." Id. ¶ 20 (citing Compl. ¶ 19; Answer ¶ 19; Pl.'s Resp. 10).

21. "On February 22, 2012, Plaintiff filed expedited antidumping and countervailing duty scope inquiry requests with Commerce regarding the subject merchandise." Id. ¶ 21 (citing Pl.'s Resp. Ex. 1 at Attach. 11).  "In connection with these requests, Plaintiff presented substantially similar

documentation to Commerce as that provided to CBP."  Id. (citing Pl.'s Resp. Ex. 1 at Attach. 11).

22. "On April 26, 2012, Plaintiff filed a protest with CBP regarding the liquidation of the entry of the subject merchandise.  The protest stated that 'Importer is on (sic) the process of a scope ruling in order to proof (sic) that ADD/CVD does not apply to cargo.'"  Id. ¶ 22 (citing Pl.'s Resp. Ex. 6 at 1).

23. "CBP Denied Plaintiff's protest on May 12, 2012."  Id. ¶ 23 (citing Pl.'s Resp. Ex. 6 at 2).

24. "On July 2, 2012, Commerce issued a final scope ruling to Plaintiff. Commerce determined that the electrical rigid metal conduit imported by Plaintiff was, in fact, finished electrical conduit and therefore outside the scope of the antidumping and countervailing duty orders."  Id. ¶ 24 (citing Pl.'s Resp. Ex. 2).  "Commerce held that 'based on record evidence, we have determined that the electrical rigid steel conduit imported by LDA Inc. falls under the Department's exclusion for finished electrical conduit because it meets the definition of electrical rigid steel conduit.'"  Id. (citing Pl.'s Resp. Ex. 2 at 8).

25. "Commerce's final scope ruling to Plaintiff acknowledged that '[o]n May 21, 2012, the Department, in its final scope ruling regarding finished electrical conduits imported by All Tools, Inc., defined 'finished electrical conduit.'"  Id. ¶ 25 (citing Pl.'s Resp. Ex. 2 at 2).

26. "'In the All Tools' Scope Ruling, the Department noted that the exclusion for 'finished electrical conduit' was not defined, and therefore solicited comments from interested parties for the purpose of defining the 'finished electrical conduit' exclusion in the CWP [(circular welded pipe)] Orders.'" Id. ¶ 26 (citing Pl.'s Resp. Ex. 2 at 6).  "Plaintiff did not participate during the comment period associated with the All Tools' Scope Ruling." Id. (citing Pl.'s Resp. Ex. 2).

27. "In connection with the All Tools Ruling, Commerce determined that 'finished electrical conduits,' which are the subject of the exclusion to the CVD and AD Orders, are Electrical Rigid Steel Conduit, Finished Electrical Metallic Tubing, and Intermediate Metal Conduit." Id. ¶ 27 (citing Pl.'s Resp. Ex. 2 at 6).

28. "In connection with the All Tools Ruling, Commerce defined Electrical Rigid Steel Conduit as:

• a threadable steel raceway of circular cross-section designed for the physical protection and routing of conductors and as an equipment grounding conductor;
• in nominal 10 ft (3. 05 m) lengths [citing ANSI C80.1];
• threaded on each end with one coupling attached;
• protected on the exterior surface with a metallic zinc coating or alternate corrosion protection [citing UL 6] coating, and on the interior surface with a zinc or organic coating;
• with the interior surface free from injurious defects;
• made to (1) American National Standard ("ANSI") CS0.1-2005 [sic] specification for electrical rigid steel conduit and marked along each length with 'Rigid Steel Conduit' or (2) Underwriters Laboratories Inc. ("UL") UL-6 specification for electrical rigid metal conduit-steel and marked along each length with 'Electrical Rigid Metal Conduit' or 'ERMC-S'; and

• marked with the manufacturer's name, trade name, or trademark or other descriptive marking by which the organization responsible for the product can be identified."

Id. ¶ 28 (citing Pl.'s Resp. Ex. 2 at 6–7).

29. "Commerce's final scope ruling specifically rejected CBP's contention that

galvanized electrical conduit had to have an internal lining of non-electrically

conducting material in order to be considered finished electrical conduit.

Commerce stated:

CBP inspected LDA Inc.'s products and determined that the products are subject to the CWP [(circular welded pipe)] Orders because, according to its laboratory results, '... the sample is not internally coated with a non-conducting liner.'  According to the Department's definition of finished electrical conduit, a 'non-conducting liner' is not a necessary component of finished electrical conduit, and in the All Tools" [sic] Scope Ruling the Department determined that similar non-electrically insulated conduit was within the exclusion for finished electrical conduit."

Id. ¶ 29 (citing Pl.'s Resp. Ex. 2 at 8–9).


**STANDARD OF REVIEW**

The court reviews denied protests de novo "upon the basis of the record made

before the court."  See 28 U.S.C. § 2640(a)(1) (2012).[4]  Thus, while the question before

the court is the same as the one that faced CBP, the record before the court may, and in

this case does, include different information.  Moreover, CBP's factual determinations are

---

[4] Further citations to Title 28 of the U.S. Code are to the 2012 edition.

presumed to be correct and the burden is on Plaintiff to rebut those presumptions.  <u>See</u>

28 U.S.C. § 2639(a)(1).

## CONCLUSIONS OF LAW

As the court has explained in its prior slip opinion, the court has jurisdiction over

Plaintiff's "civil action commenced to contest the denial of [its] protest . . . under [19 U.S.C.

§ 1515]."  28 U.S.C. § 1581(a); <u>see also</u> <u>LDA Incorporado</u>, 978 F. Supp. 2d at 1370; <u>Xerox</u>

<u>Corp. v. United States</u>, 289 F.3d 792, 793 (Fed. Cir. 2002).  CBP made a protestable

decision as to the application of the Orders to Plaintiff's entry.  <u>LDA Incorporado</u>, 978 F.

Supp. 2d at 1369–70.  CBP's application of the Orders to Plaintiff's merchandise did not

become "final and conclusive" because Plaintiff filed a timely protest contesting CBP's

decision. <u>See</u> 19 U.S.C. § 1514(a)(2).  The court's role here is defined by the nature of

its jurisdiction in this instance.  The court is not reviewing what Commerce has done, as

it would if this case involved a challenge to a scope ruling under § 1581(c). The court

exercises jurisdiction under § 1581(a) to review whether Customs' decision to apply the

Orders to Plaintiff's merchandise was in error.  Thus, the question for both Customs

below, and the court here, is whether Plaintiff's merchandise is "finished electrical

conduit."  The undisputed facts show Plaintiff's merchandise is "finished electrical conduit"

and is therefore specifically excluded from the Orders.

The scope of the court's review is a function of its jurisdiction and therefore it is

necessary to once again carefully distinguish Customs' and Commerce's role with respect

to the entry of the merchandise in this case.  The court reviews those decisions properly

within the province of Customs, <u>i.e.</u>, factual decisions regarding the merchandise and the

decision to apply the order to the merchandise.   While Congress gave the role of

determining the scope of an order to Commerce, see 19 U.S.C. § 1516a(a)(2)(B)(vi); 19

U.S.C. § 1677(25); 19 C.F.R. § 351.225, Customs, incident to its "ministerial" function of

fixing the amount of duties chargeable, must make factual findings to determine "what the

merchandise is, and whether it is described in an order" and must decide whether to apply

the order to the merchandise.  See Xerox, 289 F.3d at 794–95 (citations omitted).

The court understands the U.S. Court of Appeals for the Federal Circuit in Xerox

to have used the term "ministerial" to refer to Customs' tasks in that they cannot affect the

scope of the order and the resulting duty owed.   As the Court of Appeals has held,

Customs undeniably must act in both ministerial and non-ministerial capacities to

correctly process entries of goods subject to antidumping and countervailing duties.[5]  See

Xerox, 289 F.3d at 794.  In Xerox, the plaintiff's imported goods were paper feed belts for

electrostatic photocopiers.    Customs assessed antidumping duties based on its

---

[5] It seems contradictory to say that Customs is charged with finding facts and ascertaining whether the merchandise is "described in the order," but is nonetheless acting in a ministerial capacity.  Typically one thinks of ministerial acts as passive or involving no analysis or discretion. See Marbury v. Madison, 5 U.S. 137, 151 (1803) (explaining a ministerial officer exercises no discretion).  When Customs discerns facts and then applies those facts to the scope provided by Commerce, it is conducting analysis to some degree.  However, the Reorganization Plan of 1979 made clear, and the Courts have repeatedly affirmed, that Customs' role is "ministerial" as to the rate and amount of duties chargeable in antidumping and countervailing duty cases.  See Reorganization Plan No. 3 of 1979, §§ 5(a)(1), 93 Stat. 1381,  44 Fed. Reg. 69,273, 69,274–75 (Dec. 3, 1979), effective under Exec. Order No. 12,188 of January 2, 1980, 45 Fed. Reg. 989, 993 (1980); see also Mitsubishi Elec. Am., Inc. v. United States, 44 F.3d 973, 977 (Fed. Cir. 1994). Thus, even though Customs makes decisions as to the facts and the application of the order, Customs acts in a ministerial capacity because it cannot change the rate and amount of antidumping or countervailing duties chargeable.

determination that the belts were covered by an antidumping duty order.  Xerox Corp. v.

United States, 24 CIT 1145, 1145, 118 F. Supp. 2d 1354, 1354 (2000), rev'd 289 F.3d

792 (2002).  The importer argued that the goods were clearly outside the scope of the

order and that Customs had made a mistake of fact.  Customs denied the protest and the

importer sought judicial review.  Xerox, 24 CIT at 1145, 118 F. Supp. 2d at 1354.  The

United States Court of International Trade held that it did not have jurisdiction under 28

U.S.C. § 1581(a) to hear the case because the importer should have requested a scope

ruling from Commerce.  Xerox, 24 CIT at 1146–47, 118 F. Supp. 2d at 1355.  The Court

of Appeals, reversing the Court of International Trade, found that the goods "were not

used for power transmission and were not constructed with the materials listed in the

order . . ." and therefore were not covered by the order.  Xerox, 289 F.3d at 795.

The Court of Appeals thus held that Customs' decision was a protestable error.

The Court of Appeals in Xerox explained that:

> Customs is charged with the ministerial function of fixing "the amount of duty
> to be paid" on subject merchandise.  When merchandise may be subject to
> an antidumping duty order, Customs makes factual findings to ascertain
> what the merchandise is, and whether it is described in an order.  If
> applicable, Customs then assesses the appropriate antidumping duty.
> Such findings of Customs as to "the classification and rate and amount of
> duties chargeable" are protestable to Customs under 19 U.S.C.
> § 1514(a)(2).

Id. at 794 (internal citations omitted).  Incident to performing its function of assessing

duties on entries of goods that may or may not be subject to antidumping or countervailing

duty orders, Customs must make factual findings to determine the nature of the

merchandise.  Additionally, Xerox provides that Customs must read the language of the

order to determine whether or not the goods in question fall under that description.  The

factual analysis and application of the scope to the goods in question are decisions of

Customs.  Customs' function, while involving discretion as to the facts and the application

of the facts to the scope, cannot affect the scope of the order.  Although Customs' role as

to the scope of the order is ministerial (i.e., it can do nothing to change the scope), in

applying that scope it has made a protestable decision.  Under Xerox, errors made by

Customs in deciding whether the order applies to the goods are protestable.  See id. at

795.

The holding in Xerox is consistent with the statutory scheme.  The statute in

§ 1514(a) provides that

> [e]xcept as provided in subsection (b) of this section, . . . any clerical error,
> mistake of fact, or other inadvertence . . . adverse to the importer, in any
> entry, liquidation, or reliquidation, and, decisions of the Customs Service,
> including the legality of all orders and findings entering into the same, as
> to--
> . . .
>
> (2) the classification and rate and amount of duties chargeable,

are final and conclusive unless a protest with Customs is timely filed or the denial of such

protest is challenged at the Court of International Trade.  19 U.S.C. § 1514(a)(2).[6]  Clerical

errors, mistakes of fact and other inadvertent mistakes made by Customs are protestable

under § 1514(a).  Additionally, the statute provides that the legality and findings forming

---

[6] The decisions covered in § 1514(b) refer to "determinations made under  . . . subtitle IV
of this chapter [(19 U.S.C. §§ 1671–1677n, the countervailing and antidumping duty
laws)] which are reviewable under section 1516a of this title . . . ."  19 U.S.C. § 1514(b).
The clarification of the scope of an order by virtue of a scope ruling would be reviewable
under 19 U.S.C. § 1516a, and would not be protestable.

the basis of a decision by Customs regarding the classification, rate, and amount of duties chargeable for an entry of goods are also protestable decisions.  Therefore, as <u>Xerox</u> holds, the misapplication of the scope of an order by Customs requires Customs to both determine what the merchandise is and then apply the scope of the order to the merchandise in question.  Per the statute, both the legality of Customs' decision, as well as the findings forming the basis of that decision, are protestable and are the focus of the court's review in this case.  Thus, here the court reviews de novo whether Customs erred either in its factual analysis of the merchandise or in its decision to apply the Orders, as written by Commerce, to the merchandise.  The Orders specifically exclude finished electrical conduit.   <u>See</u> ¶ 5.[7]   Therefore, the court must determine whether the merchandise was finished electrical conduit.

Here, undisputed evidence makes clear Plaintiff's merchandise was "finished electrical conduit."  The scope of the ANSI Standard C80.1-2005 provides:

> Finished conduit is produced in nominal 10 ft. (3.05m) lengths, threaded on each end with one coupling attached.  It is protected on the exterior surface with a metallic zinc coating or alternate corrosion protection coating (as specified in the 13th edition of UL 6 in Clauses 5.3.3, 6.2.4, 7.8, and 7.9) and on the interior surface with a zinc or organic coating.

¶ 16.  It is undisputed that Plaintiff's "galvanized electrical conduit was both internally and externally coated with a non-electrically insulating material (zinc) and was suitable for electrical use in accordance with . . . UL-6 for 'electrical rigid ferrous metal conduit' and . . . ANSI[] standard C80.1-2005 for 'electrical rigid steel conduit.'"  ¶ 8 (citing Pl.'s Resp.

---

[7] All citations to a paragraph number, without more, are to the court's numbered findings of fact herein.

Ex. 1 at Attachs. 3, 6).[8]  Defendant provides no evidence that LDA's merchandise was not "finished electrical conduit."[9]  Nowhere in its papers does Defendant dispute that Plaintiff's merchandise was finished electrical conduit.[10]  Thus, as a matter of law the undisputed facts show that Plaintiff's merchandise was "finished electrical conduit."

As in Xerox, Customs here made a decision as to whether the goods were covered by the Orders.  In Xerox, Customs erred when it included the plaintiff's paper feed belts for electrostatic photocopiers in the order on industrial belts used for power transmission because the plaintiff's goods were undisputedly outside the scope of the order.  It is not clear to the court whether in Xerox Customs made any specific factual findings, or simply concluded, wrongly, that the goods fell within the scope of the order.  See Xerox Corp. v. United States, Ct. No. 97-435-TJA, Def.'s Reply 2 (filed May 21, 1999).  See also Xerox, 24 CIT at 1145, 118 (explaining that Customs denied the protest for lack of

---

[8] The parties have stipulated that Plaintiff provided Customs with information establishing that Walsall, the foreign exporter from whom Plaintiff purchased the rigid steel conduit, complied with the ANSI C80.1 and UL-6 standards.  See ¶¶ 9, 12, 15.

[9] Below, Customs mistakenly believed "the subject merchandise was not internally galvanized and was thus unfinished conduit subject to the antidumping and countervailing duty orders."  ¶¶ 11–14.  However, as Plaintiff explained, its merchandise was, in fact, internally galvanized.  Changing course, Customs then asserted "that the subject merchandise was unfinished conduit and was not suitable for electrical use because it was not internally coated with a non-conducting liner."  ¶ 14.  As Plaintiff points out, the ANSI C80.1-2005 and UL-6 standards for finished metal conduit do not require an internal coating with a non-conducting liner.  The court is unaware of why Customs thought a non-conducting liner was required.  Defendant presents no evidence speaking to this point.

[10] Defendant does contend in its Proposed Conclusions of Law that "[t]he phrase 'finished electrical conduit' was not defined in the CVD Order and AD Order at issue," and that the fact that Commerce issued a scope ruling in response to an importer's request "reveals that CVD Order and AD Order were not 'unambiguous.'"  Def.'s PCL ¶ 8 (citing Xerox, 289 F.3d at 792).

documentation).  Here, Customs initially made a pure factual mistake in its determination that the merchandise was not internally galvanized.  ¶¶ 11–14.  Ultimately, while Customs acknowledged that Plaintiff's goods were in fact internally galvanized, ¶ 14, Customs included the goods within the scope of the Orders because it believed that finished electrical conduit must be internally coated with a non-conducting liner.  ¶ 14.  Customs' belief was in error.  Although not a purely factual error, the "misapplication of the order by Customs is properly the subject of a protest under 19 U.S.C. § 1514(a)(2)."[11] Xerox, 289 F.3d at 795.

In Defendant's proposed conclusions of law, it does not dispute that the merchandise is finished electrical conduit.  Instead, Defendant claims "Plaintiff's actual dispute is with the scope of the CVD and AD Orders applied to its merchandise by CBP." Def.'s PCL ¶ 1.  This statement is incorrect.  Plaintiff challenges Customs' decision in applying the Orders to its merchandise.  The scope specifically excludes "finished electrical conduit."  Plaintiff does not challenge the reach of the scope.  Plaintiff merely claims that its merchandise is, and always has been, finished electrical conduit.

Defendant's argument raises a separate problem.  At first, Defendant's statement that "Plaintiff's actual dispute is with the scope of the CVD and AD Orders applied to its merchandise by CBP" suggests that the scope of the Orders was clear, requiring Plaintiff

---

[11] The misapplication of the order by Customs is a protestable decision.  Customs has the duty to discern facts so that it may properly apply countervailing and antidumping duty orders.  Its job in that regard is not ministerial. Customs must also apply the order to the facts.   In many cases, it is clear that the order in question applies to particular entries of goods, and Customs applies the order in a ministerial fashion. If it is wrong then it has made a ministerial error.

to seek a scope ruling from Commerce if it disagreed with the clear meaning of the Orders. However, Defendant also seeks to distinguish <u>Xerox</u> by stating that the phrase "finished electrical conduit" was ambiguous, noting that Commerce defined the phrase in the All Tools Ruling. Def.'s PCL ¶¶ 7–9 (internal citations omitted).  If Defendant is arguing that the scope was unclear, then by placing the goods within the scope of the Orders prior to a clarification by Commerce, Customs would have been interpreting the Orders, which it is not allowed to do.   As discussed above, this is the province of Commerce, not Customs.[12]  <u>See</u> Reorganization Plan No. 3 of 1979 at § 5(a)(1)(C).

---

[12] As discussed above, Customs finds facts regarding what the product is, reads the order, and applies the order to the facts if appropriate.  If Customs makes a mistake in these two tasks, as it has done here, that is a protestable decision.  However, Defendant's argument about the need to clarify the scope of the Orders would, if true, raise bigger problems for Customs in this case.  If Customs believes the scope truly needs clarification, Commerce should be consulted.  Congress's Reorganization Plan did not envision that Customs would have a role in clarifying the order.  <u>See</u> Reorganization Plan No. 3 of 1979 at § 5(a)(1)(C) (stating that the administration of antidumping and countervailing duties shall be transferred to the Commerce Department except that Customs "shall accept such deposits, bonds, or other security as deemed appropriate by the Secretary, shall assess and collect such duties as may be directed by the Secretary . . . .").

It may be that in some cases there is a concern regarding the clarity of an order and the question then becomes who should shoulder the burden of consulting Commerce. In an ideal world, Customs would have a mechanism for seeking Commerce's guidance and suspending liquidation while doing so.  However, there seems to be no regulatory provision mandating such a course.  As a result, it appears that sometimes Customs tells the importer to request a scope ruling if it does not want its goods to be covered by the order.  <u>See</u> 19 C.F.R. §§ 351.225(c), (e).  The importer can request that CBP extend the time for liquidation if there is good cause.  19 C.F.R. § 159.12(a)(1)(ii).  Sometimes it may be the case that the importer is familiar with the underlying investigation and the resulting order, and indeed may be more familiar with the order than Customs.  The importer may feel certain that the scope does not cover its product.  In such a case, the importer maybe reluctant to expend the time and resources to seek a scope ruling when it believes the scope clearly does not cover its product.  If the importer fails to request a scope ruling

—

Moreover, the Orders here were clear and there is not even a plausible argument in this case that any ambiguity could have supported Customs' inclusion of the goods in the scope.  It is always possible to find something the order did not say.  Orders are written in general terms.  However, Customs has pointed to nothing in the scope language here that could have indicated to Customs that the presence of a non-conducting liner was necessary for a product to be classified as finished electrical conduit.  The undisputed facts before Customs, and before this Court, lead to the conclusion that the subject merchandise was finished electrical conduit.

## CONCLUSION

The court finds that Plaintiff's merchandise was finished electrical conduit and, therefore, specifically excluded from the Orders.  Plaintiff's Entry No. 438-0698613-9 was

---

and Customs applies the order to the goods, then Customs will necessarily have exercised discretion as to what the order means.  Such a result might not seem unfair since the importer could have (and perhaps should have) sought a scope ruling.  Fair or not, it is simply not the scheme envisioned by Congress, and it is not the scheme so often cited by the Courts.  See Cemex, S.A. v. United States, 384 F.3d 1314, 1324 (Fed. Cir. 2004); see also Xerox Corp., 289 F.3d at 794; see also Mitsubishi Elec. Am., Inc., 44 F.3d at 976–77.  If it were the case, as Defendant suggests, that Customs believed that these Orders truly needed clarification, then Customs would have been acting beyond its authority in, nonetheless, assessing antidumping and countervailing duties on Plaintiff's merchandise.

In this case, the scope of the Orders did not reach the product at issue because the product at issue was clearly "finished electrical conduit" which is excluded from the Orders.  There is no argument before the court, even from Defendant, that Plaintiff's goods are not finished electrical conduit.  If there were any arguments that the Orders could have been interpreted to reach Plaintiff's merchandise, then such a task was for Commerce, not Customs.

not covered by the Orders and was not subject to any corresponding antidumping or countervailing duties.  CBP thus incorrectly liquidated Plaintiff's merchandise, charging additional duties that were not owed.  CBP shall reliquidate Entry No. 438-0698613-9, and refund all antidumping and countervailing duties paid on the entries with interest as provided by law.


                                                        /s/ Claire R. Kelly
                                                       Claire R. Kelly, Judge


Dated: June 19, 2015
            New York, New York